PHILLIPS, Circuit Judge, dissenting
I agree with the majority that the two officers had objectively reasonable suspicion that Hammond was armed.[1] On that point, I too rely on the information the officers obtained from PIMS-that Hammond had three weeks earlier been arrested for illegally possessing a weapon,[2] in an encounter leading police to seize the same car stopped here; that Hammond had more than a year earlier been a suspect in another weapon-possession case; and that Hammond was a documented member of the Crips gang. I also rely on Hammond's wearing Crips-gang colors that night. For me, those are the facts relevant to whether Hammond was armed.
But some other facts from that evening weigh against dangerousness, unless one takes a view that Hammond would be as likely to fire a gun at police outside their department building in well-lit conditions with many witnesses and a congested escape route.
In analyzing dangerousness, we first must ask dangerous to whom? Here, the asserted danger must be to the two officers (though, of course, any crossfire would inadvertently endanger bystanders). So the government cannot prevail on reasonable suspicion of danger just by showing that Hammond might later pose a danger to a rival gang member encountered in a dark alley. Danger is specific to the moment before the police pat down a person.
Though reciting danger-lessening facts early in the opinion, the majority never credits how they weigh against dangerousness. Among these factors are (1) that the stop was for the minor violation of a burned-out taillight; (2) that the police didn't treat the female driver as a threat to their safety; (3) that Hammond was courteous, calm, and compliant, not exhibiting anger, intoxication, or any other worrisome state;[3] and (4) that Hammond voluntarily stood outside the car's passenger-side door in a well-lit, busy intersection, surrounded by commercial buildings, with the Aurora Police Department located on a corner.
*909 In its concluding paragraph, the majority tries to limit the breadth of its holding, approving frisks (patdowns for weapons) to ensure officer safety only "when a (1) known gang member (2) who was a suspect in a prior weapons possession case and who had (3) recently been arrested in connection with another weapons case, is pulled over (4) while riding in a car that had previously been seized in connection with the individual's prior arrest, (5) while wearing colors that loudly display his affiliation with a gang involved in an ongoing feud[.]"[4] Maj. op. at 907-08.
But the opinion will be applied more broadly than that. I expect that the government will long cite this case as authorizing frisks, and I expect that the government will stress that we allowed a frisk here under all of the surrounding circumstances, not just those bearing on whether Hammond was armed. Beyond that, I expect that the government will use this case to argue that safety-protective factors don't matter in considering the totality of circumstances-after all, they're not included in the majority's five-factor analysis. That can't be right.
The majority does specifically review one risk-mitigating factor-that the stop involved two officers and two car occupants. Id. at 907. To support its conclusion that "the presence of two officers here [doesn't] ameliorate[ ] the risk[,]" the majority points out that we have never said that equal numbers "eliminate[ ] a suspect's supposed dangerousness." Id . I agree. But neither have we said that equal numbers can never defeat an objective reasonable suspicion of danger to the officers. We are on unplowed ground here, and in my view, the majority goes too far in extending the circumstances supporting frisks of persons not even suspected of a crime.
The majority may well disagree with me that we are on unplowed ground. After all, it relies on United States v. Guardado , 699 F.3d 1220, 1223-24 (10th Cir. 2012), as "holding that [a] Terry frisk was justified despite the presence of two officers and only one suspect." Maj. op. at 907. But Guardado presents markedly different facts from this case. In Guardado , a suspected gang member (Guardado) fled his compatriots when an officer approached the group at about 1:00 a.m. in an "extremely high crime area." Guardado , 699 F.3d at 1221-22. As the man ran, he kept one hand in front of his body, leading the officer to believe he was trying to conceal evidence or a weapon. Id . at 1222. Upon physically subduing Guardado, the officers strained to remove his hand from underneath his body. Id. After doing so, and handcuffing him, one of the officers frisked Guardado's waistband for weapons. Id. This far different situation makes Guardado a poor candidate to support the majority's extending the availability of frisks.
The majority also relies on Garcia II . I see Garcia II as an easier case, with facts far different from ours. The stop in that case was on a "sparsely travelled" avenue, with just one officer making the stop. Garcia II , 751 F.3d at 1140. After arresting the driver, the officer needed to inventory the car, so the officer had to turn his back to Garcia; the officer apparently couldn't await backup, because of staffing issues; the officer remembered a recent encounter in which Garcia had fled and, when caught, required tasering after assuming a fighting stance with fists clenched; the officer knew that Garcia had a violent felony (armed robbery); the officer knew that Garcia was a drug user, especially heroin; and during *910 the stop, the officer observed that Garcia acted nervously, avoiding eye contact and playing with his hands. Id. at 1140-41.The facts in Garcia II present far more likelihood of danger to officer safety than do those here.[5]
As support for its new rule-that a person like Hammond, reasonably suspected of being armed, always presents a danger in the majority's listed circumstances-the majority makes a fact finding better suited for the district court. Namely, the majority asserts that "if Mr. Hammond had a gun readily available in his clothing, it could quickly be grabbed and used against both officers or used to hold one hostage." Maj. op. at 907. Maybe so. But I think that the district court needs to make that type of finding based on meaningful evidence from the government.[6] And the district court didn't.
In my view, the district court collapsed armed and dangerous into one condition. In other words, it assumed that if the officers had objectively reasonable suspicion that Hammond was armed, then they would automatically have objectively reasonable suspicion that he endangered them during the misdemeanor stop. See R. vol. 3 at 46-51. The district court didn't explain how Hammond might endanger an alert officer intently watching him for the few minutes needed to complete the taillight stop. Id. Instead, the district court declared the frisk legal based on "common sense," saying that the officer had to do something other than ask Hammond to sit by the curb[7] or ask him how he was doing that evening or about the Denver Broncos. R. vol. 3. at 50. To spare the officer any awkward small talk, I guess, the district court approves a frisk instead. I would require more-a fact finding, based on meaningful evidence, that the officers had objectively reasonable suspicion that Hammond would endanger them during the stop.

"Pat-down searches are constitutional when an officer has reasonable suspicion that an individual is 'armed and dangerous.' " United States v. Garcia (Garcia II ), 751 F.3d 1139, 1142 (10th Cir. 2014) (citing United States v. Rice , 483 F.3d 1079, 1082 (10th Cir. 2007) ).

Nowhere in the record, or during oral argument, did the government identify what made this earlier weapon possession illegal. Nor has it done so for the instant arrest, at least until the officers learned that the already-arrested Hammond had a felony conviction.

The district court found "that at all times Mr. Hammond behaved himself, was cooperative, was not aggressive. There's no indication of any furtive movements. There's no indication of any nervous behaviors, none of those kinds of things, nor do the officers claim any of that." R. vol. 3 at 48-49.

The majority also says that the officers "suspected" and later "confirmed" that Hammond was a felon. Maj. op. at 904, 907. I don't see this in the record.

The majority also relies on United States v. DeJear , 552 F.3d 1196 (10th Cir. 2009), as a case where the facts "were sufficient to establish reasonable suspicion that the suspect was armed and dangerous." Maj. op. at 906. I read DeJear as a Terry-stop case, upholding reasonable suspicion of criminal activity, not reasonable suspicion that the person was armed and dangerous. DeJear , 552 F.3d at 1201 ("[T]he district court properly concluded that [the officer] had reasonable suspicion to detain Mr. DeJear.").

Surely the government could provide evidence, including officer testimony or statistics, explaining common outcomes in this type of circumstance.

As opposed to frisking Hammond, which Terry recognizes is a significant Fourth Amendment event, see Terry v. Ohio, 392 U.S. 1, 17-18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the officers might have protected themselves by actions less intrusive than a frisk.